IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

**JACK W.,**[1]

       Plaintiff,                           Civ. No. 3:19-cv-00507-CL

             v.                     **OPINION AND ORDER**

**COMMISSIONER,**
**SOCIAL SECURITY ADMIN.**

       Defendant.

_____

MARK D. CLARKE, Magistrate Judge.

      Plaintiff Jack W. seeks judicial review of the final decision of the Commissioner of the Social Security Administration ("SSA") denying his application for Title II Disability Insurance Benefits ("DIB") and, in part, his application for Title XVI Supplemental Security Income ("SSI") pursuant to 42 U.S.C. §§ 1381a and 1382c(a)(3)(A). For the reasons discussed below, the Commissioner's decision is REVERSED and REMANDED for immediate payment of benefits.

---

[1] In the interest of privacy, this Opinion and Order uses only the first name and the initial of the last name of the non-governmental party or parties in this case.

## BACKGROUND AND PROCEDURAL HISTORY[2]

Plaintiff was born in May 1959. Tr. 162, 165. Plaintiff was partially awarded SSI benefits in a February 5, 2019 ALJ decision, with a disability onset date of January 1, 2013. Tr. 1589-1609. However, the ALJ denied Plaintiff's DIB claim, finding that he was not disabled between the alleged onset date of August 17, 2006 and September 30, 2008, the date last insured. Tr. 1609. Plaintiff appeals to this court seeking a determination that the Social Security Administration erroneously determined he has not been disabled from his alleged onset date of August 17, 2006 through December 31, 2012, the day prior to the date of commencement of his partial SSI award. Pl.'s Br. 4; Def.'s Br. 2. To qualify for DIB benefits, Plaintiff must establish that he was disabled under the Act between the alleged onset date of August 17, 2006 through September 30, 2008. Plaintiff was adjudged to have the following severe impairments prior to the adjudged January 1, 2013 onset of disability: "degenerative disc disease of the lumbar spine status post laminectomy in 2007; bipolar disorder versus a depressive disorder versus a mood disorder; a personality disorder, NOS [not otherwise specified]; marijuana abuse; methamphetamine use; diabetes mellitus and a left shoulder condition." Tr. 1592. The ALJ determined "neuropathy" was an additional severe impairment as of the disability onset date, which qualified Plaintiff for SSI. Tr. 1592-93. Plaintiff alleges that the ALJ's RFC formulation for the period prior to January 1, 2013 failed to encompass the severity of his bipolar disorder, anxiety, posttraumatic stress disorder ("PTSD"), and personality disorder NOS, constituting legal error. Pl.'s Br. 6.

///

///

---

[2] Citations to "Tr." refer to the page(s) indicated in the official transcript of the administrative record filed herein.

## PROCEDURAL BACKGROUND

This case has a very complex procedural history, and because much of that history is not relevant to the issues now before the Court, the Court opts not to recount it in full.[3] Plaintiff originally filed claims for DIB and SSI alleging a disability onset date of August 17, 2006. Tr. 162-72. As noted above, Plaintiff's date last insured for purposes of the DIB claim was September 30, 2008. Briefly, the original claims were rejected following a hearing and ALJ decision of January 19, 2010. Tr. 27-46. Following multiple appeals to the Appeals Council and this federal court, Plaintiff eventually was adjudged disabled in a Partially Favorable decision dated February 5, 2019, awarding SSI beginning on January 1, 2013, but denying the SSI claim in part and the DIB claim in full. Tr. 1585-1621. Plaintiff now appeals to this Court, seeking DIB and SSI benefits beginning on the alleged onset date of August 17, 2006. As such, the parties agree the relevant period in this matter is between August 17, 2006 and December 31, 2012. Pl.'s Br. 4; Def.'s Br. 2.

## DISABILITY ANALYSIS

A claimant is disabled if he or she is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than 12 months[.]" 42 U.S.C. § 423(d)(1)(A). "Social Security Regulations set out a five-step sequential process for determining whether an applicant is disabled within the meaning of the Social Security Act." *Keyser v. Comm'r. Soc. Sec. Admin.*, 648 F.3d 721, 724 (9th Cir. 2011). Each step is potentially dispositive. 20 C.F.R. §§ 404.1520(a)(4), 426.920(a)(4). The five-step sequential process asks the following series of questions:

1.    Is the claimant performing "substantial gainful activity" (SGA)? 20 C.F.R. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i). This activity is work involving

---

[3] *See* Pl.'s Br. 4-5 for a more detailed summary.

significant mental or physical duties done or intended to be done for pay or profit. 20 C.F.R. §§ 404.1510, 416.910. If the claimant is performing such work, she is not disabled within the meaning of the Act. 20 C.F.R. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i). If the claimant is not performing substantial gainful activity, the analysis proceeds to step two.

2.    Is the claimant's impairment "severe" under the Commissioner's regulations? 20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii). Unless expected to result in death, an impairment is "severe" if it significantly limits the claimant's physical or mental ability to do basic work activities. 20 C.F.R. §§ 404.1521(a), 416.921(a). This impairment must have lasted or must be expected to last for a continuous period of at least 12 months. 20 C.F.R. §§ 404.1509, 416.909. If the claimant does not have a severe impairment, the analysis ends. 20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii). If the claimant has a severe impairment, the analysis proceeds to step three.

3.    Does the claimant's severe impairment "meet or equal" one or more of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1? If so, then the claimant is disabled. 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii). If the impairment does not meet or equal one or more of the listed impairments, the analysis proceeds to the "residual functional capacity" ("RFC") assessment.

     a.    The ALJ must evaluate medical and other relevant evidence to assess and determine the claimant's RFC. This is an assessment of work-related activities that the claimant may still perform on a regular and continuing basis, despite any limitations imposed by his or her impairments. 20 C.F.R. §§ 404.1520(e), 404.1545(b)-(c), 416.920(e), 416.945(b)-(c). After the ALJ determines the claimant's RFC, the analysis proceeds to step four.

4.    Can the claimant perform his or her "past relevant work" ("PRW") with this RFC assessment? If so, then the claimant is not disabled. 20 C.F.R. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv). If the claimant cannot perform his or her PRW, the analysis proceeds to step five.

5.    Considering the claimant's RFC and age, education, and work experience, is the claimant able to make an adjustment to other work that exists in significant numbers in the national economy? If so, then the claimant is not disabled. 20 C.F.R. §§ 404.1520(a)(4)(v), 404.1560(c), 416.920(a)(4)(v),

> 416.960(c). If the claimant cannot perform such work, he or she is disabled.
> *Id.*

*See also Bustamante v. Massanari*, 262 F.3d 949, 954-55 (9th Cir. 2001).

The claimant bears the burden of proof at steps one through four. *Id.* at 954. The Commissioner bears the burden of proof at step five. *Id.* at 953-54. At step five, the Commissioner must show that the claimant can perform other work that exists in significant numbers in the national economy, "taking into consideration the claimant's residual functional capacity, age, education, and work experience." *Tackett v. Apfel*, 180 F.3d 1094, 1100 (9th Cir. 1999) (internal citations omitted); *see also* 20 C.F.R. §§ 404.1566, 416.966 (describing "work which exists in the national economy"). If the Commissioner fails to meet this burden, the claimant is disabled. 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v). If, however, the Commissioner proves that the claimant is able to perform other work existing in significant numbers in the national economy, the claimant is not disabled. *Bustamante*, 262 F.3d at 954-55; *Tackett*, 180 F.3d at 1099.

## THE ALJ'S FINDINGS

Applying the above analysis, the ALJ made the following findings in the February 5, 2019 decision:

1. The claimant meets the insured status requirements of the Social Security Act through September 30, 2008. Tr. 1592.

2. The claimant has not engaged in SGA since the alleged onset date. *Id.*

3. Since the alleged onset of disability, August 17, 2006, the claimant has had the following severe impairments: degenerative disc disease of the lumbar spine status post laminectomy in 2007; a bipolar disorder versus a depressive disorder versus a mood disorder; a personality disorder, NOS; marijuana abuse; methamphetamine use; diabetes mellitus; and a left shoulder condition. Beginning on the established onset date of disability, January 1, 2013, the claimant has had the following severe impairments: neuropathy. Tr. 1592-93.

4. Since August 17, 2006, the claimant has not had an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix I. Tr. 1593.

5. Prior to January 1, 2013, claimant has had the RFC to perform light work with the following limitations:

   "[T]he claimant could occasionally climb ramps and stairs but never climb ladders, ropes or scaffolds. The claimant could occasionally perform all other postural activities (balance, stoop, kneel, crouch, and crawl). The claimant could frequently reach overhead bilaterally. The claimant could perform work involving simple routine tasks with no public contact and only occasional superficial interaction with coworkers and could have occasional interaction with supervisors." Tr. 1595.

6. Beginning on January 1, 2013, the claimant has the RFC to perform light work with the following limitations:

   "[T]he claimant could occasionally climb ropes and stairs but never climb ladders, ropes or scaffolds. The claimant could occasionally perform all other postural activities (balance, stoop, kneel, crouch, and crawl). The claimant could perform work involving simple routine tasks with no public contact and only occasional superficial interaction with coworkers and could have occasional interaction with supervisors. The claimant would be off-task 20% of the time of the workday or absent two or more days per month." Tr. 1604.

7. Since August 17, 2006, the claimant has been unable to perform any past relevant work. Tr. 1607.

8. Prior to the established disability onset date, the claimant was an individual closely approaching advanced age. The claimant's age category has not changed since the established disability onset date. *Id.*

9. The claimant has at least a high school education and is able to communicate in English. *Id.*

10. Prior to January 1, 2013, transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled" whether or not the claimant has transferable job skills. Beginning on January 1, 2013, the claimant has not been able to transfer job skills to other occupations. *Id.*

11. Prior to January 1, 2013, considering the claimant's age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that the claimant could have performed. [Including Photocopying Machine Operator; Assembler, Small Products I; and Electronic Assembler.] Tr. 1607-08.

12. Beginning on January 1, 2013, considering the claimant's age, education, work experience, and residual functional capacity, there are no jobs that exist in significant numbers in the national economy that the claimant can perform. Tr. 1608.

13. The claimant was not disabled prior to January 1, 2013, but became disabled on that date and has continued to be disabled through December 16, 2014. Tr. 1609.

14. The claimant was not under a disability within the meaning of the Social Security Act at any time through September 30, 2008, the date last insured. *Id.*

15. The claimant's substance use disorder(s) is not a contributing factor material to the determination of disability. *Id.*

*See* Tr. 1592-1609 (citation to statutes, regulations, and rules omitted).

Consequently, the ALJ concluded Plaintiff was not disabled as defined by the Social Security Act prior to January 1, 2013 but was disabled as of that date, through December 16, 2014.[4] Tr. 1609; *see* Pl.'s Br. 4.

## STANDARD OF REVIEW

The reviewing court must affirm the Commissioner's decision if it is based on the proper legal standards and the legal findings are supported by substantial evidence in the record. 42 U.S.C. § 405(g); *Batson v. Comm'r Soc. Sec. Admin.*, 359 F.3d 1190, 1193 (9th Cir. 2004); *see also Hammock v. Bowen*, 879 F.2d 498, 501 (9th Cir. 1989). "'Substantial evidence' means 'more than a mere scintilla but less than a preponderance,' or more clearly stated, 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Bray v. Comm'r Soc. Sec. Admin.*, 554 F.3d 1219, 1222 (9th Cir. 2009) (quoting *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995)). In reviewing the Commissioner's alleged errors, this Court must weigh "both the evidence that supports and detracts from the [Commissioner's] conclusions." *Martinez v. Heckler*,

---

[4] Plaintiff filed a subsequent application for SSI on December 16, 2014, and eventually was found disabled as of that date. *See* Tr. 1589.

807 F.2d 771, 772 (9th Cir. 1986). Variable interpretations of the evidence are insignificant if the Commissioner's interpretation is rational. *Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005).

Where the evidence before the ALJ is subject to more than one rational interpretation, the Commissioner's conclusion must be upheld. *Batson*, 359 F.3d at 1198 (citing *Andrews*, 53 F.3d at 1041). "However, a reviewing court must consider the entire record as a whole and may not affirm simply by isolating a 'specific quantum of supporting evidence.'" *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 882 (9th Cir. 2006) (quoting *Hammock*, 879 F.2d at 501). Additionally, a reviewing court "cannot affirm the [Commissioner's] decision on a ground that the [Administration] did not invoke in making its decision." *Stout v. Comm'r Soc. Sec. Admin.*, 454 F.3d 1050, 1054 (9th Cir. 2006) (citations omitted). Finally, a court may not reverse an ALJ's decision on account of an error that is harmless. *Id.* at 1055-56. "[T]he burden of showing that an error is harmful normally falls upon the party attacking the agency's determination." *Shinseki v. Sanders*, 556 U.S. 396, 409 (2009).

Even where findings are supported by substantial evidence, "the decision should be set aside if the proper legal standards were not applied in weighing the evidence and making the decision." *Flake v. Gardner*, 399 F.2d 532, 540 (9th Cir. 1968). Under sentence four of 42 U.S.C. § 405(g), the reviewing court has the power to enter, upon the pleadings and transcript record, a judgment affirming, modifying, or reversing the decision of the Commissioner, with or without remanding the case for a rehearing.

## DISCUSSION

Plaintiff presents the following issues on appeal:

1. Did the ALJ properly evaluate the medical source opinions of record?

2. Did the ALJ properly determine neuropathy was non-severe prior to January 1, 2013 and that it did not meet a listing?

3. Did the ALJ properly evaluate the subjective symptom testimony of record?

4. Did the ALJ properly evaluate the lay witness statements of record?

5. Was the RFC for the period prior to January 1, 2013 supported by substantial evidence and include all the relevant functional limitations, and consequently, were the hypothetical questions to the VE and the resultant step five finding proper?

For the following reasons, I find the ALJ improperly evaluated the record evidence and provided legally insufficient reasons support key findings. The ALJ's decision is, therefore, reversed.   The discussion issues that follow pertain to the period from the alleged onset date through December 31, 2012.

## I.    Medical Opinion Evidence

Plaintiff contends the ALJ failed to properly evaluate the medical source opinions of the following individuals: Scott Alvord, Psy.D.; Joseph Eisenberg, M.D.; Isabel Toledo-Silvestre, PMHNP; Thomas Dodson, M.D.; John Adler, M.D.; Caleb Burns, Ph.D.; James Powell, Psy.D.; Sara Knepper, QMHP.

An ALJ must consider the acceptable medical source opinions of record and assign weight to each. 20 C.F.R. §§ 404.1527(c), 416.927(c). In this respect, an ALJ is responsible for resolving conflicts and ambiguities in the medical evidence. *Reddick v. Chater*, 157 F.3d 715, 722 (9th Cir. 1998). To reject the contradicted opinion of a treating or examining physician, the ALJ must provide specific and legitimate reasons for doing so. *Lester v. Chater*, 81 F.3d 821, 830-31 (9th Cir. 1995). The opinion of a non-examining medical consultant alone does not constitute substantial evidence sufficient to reject the opinion of a treating or examining physician. *Morgan*

*v. Commissioner of Social Sec. Admin.*, 169 F.3d 595, 602 (9th Cir. 1999). "An ALJ can satisfy the substantial evidence requirement by setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings." *Garrison v. Colvin*, 759 F.3d at 995, 1012 (9th Cir. 2014) (citing *Reddick*, 157 F.3d at 725).

An ALJ may discount an otherwise valid medical source opinion for a variety of reasons, such as if it is overly conclusory, poorly supported by or inconsistent with the objective medical record, or inordinately reliant on a claimant's self-reported symptoms, particularly where the ALJ provides clear and convincing reasons to discredit the symptom allegations. *See, e.g.*, *Coleman v. Saul*, 979 F.3d 751, 757-58 (9th Cir. 2020). However—and particularly relevant to this matter— rejecting the medical opinion of a treating or examining mental health provider because the opinion relies on the claimant's subjective symptom reports is perilous business. The Ninth Circuit has stressed that,

> [t]he report of a psychiatrist should not be rejected simply because of the relative imprecision of the psychiatric methodology . . . [p]sychiatric evaluations may appear subjective, especially compared to evaluation in other medical fields. Diagnosis will always depend in part on the patient's self-report, as well as on the clinician's observations of the patient. But such is the nature of psychiatry. Thus, allowing an ALJ to reject opinions based on self-reports does not apply in the same manner to opinions regarding mental illness.

*Buck v. Berryhill*, 869 F.3d 1040, 1049 (9th Cir. 2017) (internal citations omitted); *see, e.g.*, *Raicevic v. Saul*, --- F. App'x ----, 2021 WL 581351 (9th Cir. Feb. 11, 2021) ("[C]linical interviews and mental status evaluations "are objective" measures" that "cannot be discounted as a 'self-report.'") (quoting *id.*).

**A.  Scott Alvord, Psy.D.**

Dr. Alvord examined Plaintiff on three occasions: twice in May 2013, and once in November of the same year, and produced a comprehensive psychological evaluation. *See* Tr.

1408-17. Dr. Alvord's report was based on a clinical interview, a mental status examination, a review of numerous medical records and medical opinions, and a battery of standard psychological tests. Tr. 1408-09. Dr. Alvord found noteworthy Plaintiff's disheveled appearance at the first two examinations, in addition to visible signs of depression including tearful affect. Tr. 1411. Although Plaintiff was "generally pleasant and cooperative," the doctor found developing a rapport required "some difficulty," and Plaintiff "frequently responded to [his] questions with mild irritability, at times agitation." Tr. 1412. At the third encounter, the doctor found Plaintiff to be "acutely manic," as he "spoke in a rapid, rambling, tangential manner and was quite animated, both regarding the volume and prosody of his voice, as well as his physical movements." The doctor "had to instruct him at least two times to 'sit down and relax' before we were able to do testing. He was quite agitated." *Id.* Thereafter, Plaintiff's "mood was noted to shift rapidly, becoming quite tearful[.]" *Id.* Plaintiff's thought content was "inconsistent," fluctuating between intact and "jump[ing] from topic to topic and [] very difficult to redirect." Tr. 1412-13. "Insight into the nature of his condition was considered impaired." *Id.*

Based on the clinical interview, review of the medical record, and psychological testing, Dr. Alvord determined plaintiff to be "suffering from an unfortunate combination of chronic bipolar disorder, PTSD, as well as suspected cognitive disorder." Tr. 1414. The doctor supported his diagnoses with relatively lengthy and thorough explanations. Tr. 1414-16. Notably, Dr. Alvord opined that Plaintiff's "ability to function in an occupational setting is considered profoundly limited . . . I do not believe he will be capable of even very simple/repetitive work . . . given inconsistencies of functioning related to chronic Bipolar disorder as well as his tendency to over-react/become aggressive/irritable/angry related to PTSD." Tr. 1415-16. Plaintiff's work history "[wa]s judged diagnostic of a history of PTSD and Bipolar Disorder." Tr. 1416. His "overall

adaptive abilities are judged to fall in the severe range of impairment . . . [h]is prognosis, unfortunately, is poor." *Id.*

The ALJ provided a summary of Dr. Alvord's examinations and conclusions. Tr. 1602-03. Ultimately, the ALJ accorded "very little weight" to the medical opinion. Tr. 1603. In support of his finding, the ALJ identified the following rationales: Plaintiff's dishonesty with the doctor regarding his drug use and criminal history, and back pain reports inconsistent with other medical evidence, and general overreliance on Plaintiff's subjective symptom reports. *Id.*

The ALJ's evaluation of Dr. Alvord's report is erroneous on several fronts. With regards to Plaintiff's dishonesty, the doctor addressed Plaintiff's marijuana use, noting that although Plaintiff denied contemporaneous use of the drug, his extended abstinence "suggests that his cognitive issues are chronic . . . [and] reflect multiple etiologies including probably TBI [traumatic brain injury], severe anxiety and depression, as well as disorganized thought processes related to episodes of mania." Tr. 1416. Although the ALJ appeared to imply that Plaintiff's manic affect and behavior at the third examination may have been related to unreported methamphetamine use, the finding is inconsistent with the ALJ's finding that drug use is not material to the issue of disability in this case. Tr. 1609. Further, the ALJ found Plaintiff suffers from "a bipolar disorder versus depressive disorder versus a mood disorder." Tr. 1592. Moreover, Plaintiff's manic bipolar signs and symptoms were documented on several occasions by his treating physician, Dr. Eisenberg, corroborating Dr. Alvord's assessment. *See* Tr. 1429, 1432, 1438, 1448, 1583. Dr. Eisenberg's diagnoses of Bipolar Disorder I and PTSD were rendered with the knowledge of Plaintiff's history of marijuana and methamphetamine use, and concluded the symptoms he observed were "not substance induced," and he was "largely compliant" with his prescribed medication regimen, and Dr. Eisenberg also noted "[n]o appreciable change in his mood or affect

. . . during his prolonged period of abstinence" during 2009-10. Tr. 1583. For these reasons, the ALJ's rationale is erroneous considering the record as a whole.

The fact that a claimant has a criminal history is immaterial to the disability determination. Moreover, the fact that Plaintiff was not forthcoming about his criminal history is also immaterial, as an ALJ may not utilize a claimant's character or truthfulness in rejecting symptom allegations. *See* Social Security Ruling ("SSR") 16-3p, 2017 WL 5180304, at *11 (Oct. 25, 2017) ("our adjudicators will not assess an individual's overall character or truthfulness in the manner typically used during an adversarial court litigation"). For this reason, any inconsistent statements Plaintiff made about the frequency of his back pain is also erroneous—not to mention the fact that Dr. Alvord's opinions were based on Plaintiff's mental impairments rather than his physical impairments. In short, the ALJ's rationales on these issues are clearly erroneous.

Finally, as explained in the above discussion of *Buck*, the ALJ improperly rejected Dr. Alvord's opinion because it was based on Plaintiff's "subjective" symptoms. In the context of clinical psychology, such self-reports are generally considered probative evidence, and the error is particularly egregious here, where not only did Dr. Alvord consider Plaintiff's complaints, but also his work history, the doctor's own clinical observations on three separate occasions, and valid psychological testing. *See Buck*, 869 F.3d at 1049. Adding insult to the ALJ's injury, Dr. Alvord provided unusually thorough explanations for his diagnoses and medical findings.

The Commissioner argues that because Dr. Alvord's opinion was rendered after the period at issue in the instant matter, any ALJ errors are harmless. This argument is unpersuasive considering that Dr. Alvord explicitly determined Plaintiff's mental impairments were chronic in nature and consistent with his work history and medical evidence predating 2008—and in fact finding them "diagnostic of a history of PTSD and Bipolar Disorder." *See* Tr. 1408-09, 1415-16.

The Commissioner's remaining arguments are equally unpersuasive based on the discussion above.

In all, the ALJ's decision to give Dr. Alvord's medical opinion "very little weight" is woefully inconsistent with well-established Ninth Circuit precedent and is demonstrably unsupported by substantial evidence.

### B.    Joseph Eisenberg, M.D.

Plaintiff's treating physician, Dr. Eisenberg, provided a letter in support of Plaintiff's disability claim, dated November 22, 2013. Tr. 1583-84. He indicated he had treated Plaintiff for two years (beginning some time in 2011) and had "gotten to know [Plaintiff] well." Tr. 1583. He stated that although he is skeptical of many of his patients who claim to be disabled, such was not the case with Plaintiff's claim. *Id.* The doctor stated that Plaintiff is disabled based on his mental impairments alone. *Id.*

Dr. Eisenberg diagnosed Bipolar Disorder I and PTSD. *Id.* The doctor recounted associated symptoms including irritability, anger, anxiousness, depression, and mania; and that regardless of whether Plaintiff's mood was "up or down," it was "never normal." *Id.* As noted *supra*, Dr. Eisenberg acknowledged his awareness of Plaintiff's occasional methamphetamine use but explained that Plaintiff's objective drug tests during 2009-10 were normal, and moreover, that Plaintiff's outward symptoms remained abnormal even during the period of known sobriety. *Id.* Dr. Eisenberg therefore opined that the symptoms "are not substance induced." *Id.* The doctor also outlined Plaintiff's physical impairments as regards to diabetes (which is poorly controlled in part due to mental impairment), prostate problems, Hepatitis C, and musculoskeletal problems. Tr. 1583-84. The doctor opined that it would be "doubtful" Plaintiff could work around others, and

that "his problems have been of a longstanding nature," and disabling prior to September 30, 2008. Tr. 1584.

The ALJ assigned "little weight" to Dr. Eisenberg's opinion "because it appears to largely be based on the claimant's self-reports and behavior," and due to inconsistencies in Plaintiff's symptom reporting, the self-reports are unreliable. Tr. 1603. As Plaintiff's treating physician, Dr. Eisenberg's opinion ought to be accorded the greatest weight by default but may be rejected for specific and legitimate reasons in favor of a contradictory medical opinion. *Lester*, 81 F.3d at 830-31. For the same reasons the ALJ erred in rejecting Dr. Alvord's assessments of Plaintiff's mental impairments, rejecting Dr. Eisenberg's mental health assessment, which is predicated on not only treatment over time, but the doctor's own observations in conjunction with objective drug testing, the ALJ erred under *Buck*. Indeed, it is absurd to discount the doctor's opinion based on Plaintiff's "behavior," which is highly probative in the context of mental health assessment. *Buck*, 869 F.3d at 1049. Further, while inconsistencies in symptom allegations is generally a valid reason to discount a Plaintiff's complaints, the ALJ failed to identify those inconsistencies aside from the general assertion of inconsistency, and moreover, it is clear that bipolar disorder produces a range of symptoms which may appear contradictory, such as manic highs and depressive lows, which are completely consistent with the condition itself. In short, the ALJ's conclusion fails to meet the specific-and-legitimate standard, if it can be said to be rational at all.

The Commissioner argues Dr. Eisenberg's opinion is minimally probative because the doctor primarily treated Plaintiff's physical conditions and did not record observations of mania in his chart notes. Def.'s Br. 5-6. There are at least two problems with the argument. First, the ALJ did not invoke inconsistency with the medical record as a rationale to reject the opinion. Second, the ALJ did not suggest the opinion was minimally probative because Dr. Eisenberg primarily

treated physical ailments. Both are impermissible *post hoc* rationalizations for which the Court may not affirm the non-disability decision. *Bray*, 554 F.3d at 1225-26 (citation omitted). The ALJ erred.

### C. Isabel Toledo-Silvestre, PMHNP

Psychiatric mental health nurse practitioner Toledo-Silvestre provided her medical opinion in a three-page functional assessment worksheet dated September 29, 2010. Tr. 788-90. She identified several areas where Plaintiff has "marked" or "extreme" limitations, including: (1) ability to understand short and simple instructions; (2) ability to carry out detailed instructions; (3) ability to maintain attention and concentration; (4) ability to maintain acceptable attendance and punctuality; (5) ability to sustain an ordinary work routine without special supervision; (6) ability to work with others without distraction; (7) ability to work without interference from mental symptoms requiring extra breaks; (8) ability to interact appropriately with the public; (9) ability to interact appropriately with supervisors; (10) ability to get along with coworkers; (11) ability to meet socially-acceptable standards of neatness and cleanliness; (12) ability to respond to changes in the workplace; (13) ability to travel to unfamiliar locations or use public transportation; (14) ability to set realistic goals and make plans independently; (15) maintaining acceptable social functioning; and (16) maintaining acceptable concentration, persistence, or pace. *Id.* Other areas were rated as "moderate," and none were rated as insignificant or mild. *See id.* The PMHNP also indicated Plaintiff would have for or more episodes of decompensation of extended duration. Tr. 790. She explained the bases for her assessments were Plaintiff's struggles with bipolar disorder and depression, suicidal ideation and suicide attempts, resulting in the inability to control emotions at a level acceptable for maintaining employment. *Id.* She indicated her opinion applied to the time she began treating him in January 2010, at minimum. *Id.*

The ALJ accorded "little weight" to Ms. Toledo-Silvestre's opinion. Tr. 1602. Once again, the ALJ cited overreliance on subjective symptom reports "and behavior," as well as "inconsistent statements about drug use." *Id.* The ALJ also cited inconsistencies in the PMHNP's treatment notes after 2010, such as euthymic mood, cooperative presentation, and tests reflecting "good cognitive abilities." *Id.* The ALJ also discounted her opinion regarding four episodes of decompensation, because evidence reflected "only one brief psychiatric hospitalization." *Id.*

For the same reasons described above as pertaining to Drs. Alvord and Eisenberg, the ALJ's first three rationales—subjective symptom reports and inconsistent reports about drug use— are invalid considering the overall medical record in this case. *Supra*. As for the ALJ's finding that the medical opinion is inconsistent with Ms. Toledo-Silvestre's clinical observations of euthymic mood, cooperative demeanor, and cognitive abilities, her chart notes and other contemporaneous clinical observations by other providers reflect significant mental health symptoms relative to his bipolar disorder and PTSD diagnoses, although not at every visit. For example, in April 2013 his mood was worse albeit in the absence of medication (Tr. 1443), and his mood was improved but notably anxious in March 2013 (Tr. 1447). In January and February 2013, he was able to stay focused at his appointment to discuss his continued problems managing his diabetes medications. Tr. 1450-51. His mood was "anxious but improved" in late December 2012, but he had "a very hard" time focusing earlier in the month. Tr. 1454, 1456. Plaintiff's mood and affect was "depressed vs. agitated" in the previous month, November 2012. Tr. 1458. On the other hand, Ms. Toledo-Silvestre observed him to be "[c]lear, logical, [and] coherent" in February 2011, and she felt his mental impairments were "OK," consistent with the ALJ's finding that her notes record minimal mental health symptoms at times. Tr. 1488. Plaintiff also demonstrated mild symptoms in December 2010, although Ms. Toledo-Silvestre feared he could slip into severe depression

without medications. Tr. 1489. Still, in the previous month—November 2010—he was observed to be talkative to the extent Ms. Toledo-Silvestre suspected mania, and Plaintiff cried easily. Tr. 1491-92. He continued to be diagnosed with bipolar disorder and PTSD throughout the period described.

In the assessing the severity of mental health impairments, it is inappropriate for an ALJ to discount a claimant's occasional periods of improvement despite a medical record that reflects waxing and waning of symptoms, especially in the context of bipolar disorder, where one of the characteristics of the condition is in fact waxing and waning symptoms and functionality. *See Garrison*, 759 F.3d at 1017-18. The principle articulated in *Garrison* is certainly relevant here, particularly considering the relatively mountainous medical opinion evidence depicting persistent limitation far beyond the RFC as formulated, despite occasions of diminished symptoms. Moreover, although Plaintiff showed improvement on some occasions following Ms. Toledo-Silvestre's September 2010 medical assessment, the evidence certainly does not reflect a trend of improvement over time.

Plaintiff also argues that the ALJ erred in rejecting Ms. Toledo-Silvestre's assessment of four episodes of decompensation. *See* Tr. 790. In support, Plaintiff points to episodes of extreme functional limitation, in addition to his hospitalization in 2009. For example, treating physician Thomas Dodson, M.D., explained in July 2009 that Plaintiff's behavior "was dangerous prior to admission," including suicidal thoughts and "several recent episodes in which he drove his car at high speed on the highway," in excess of 100 miles per hour. Tr. 690; *see also* Tr. 781. Months later, in February 2010, he was noted to be "on the high risk [suicidal ideation] list," which he was placed on in the previous month by Ms. Toledo-Silvestre. Tr. 748, 778. In all, although Plaintiff may have had only psychiatric admission in the relevant time period of treatment with the PMNHP,

he was regularly noted to have extreme symptoms at times, and chronic suicidal ideation. Thus, although he may not have had repeated episodes of decompensation as it is understood under the Act, the term of art is not defined in the worksheet Ms. Toledo-Silvestre completed. On balance, although the ALJ was not wrong to find that her assessment of four episodes of decompensation as defined under the Act was not fully supported by the record, such does not negate the other symptoms and limitations Ms. Toledo-Silvestre set forth in her 2010 opinion. The ALJ's decision to accord little weight to her opinion overall is erroneous.

### D. Thomas Dodson, M.D.

Treating physician Dr. Dodson provided a letter in support of Plaintiff's applications on November 24, 2009. Tr. 723. He indicated Plaintiff suffered from "severe bipolar disorder and also has a personality disorder diagnosis." *Id.* The doctor noted symptoms including incoherence at times, digressive speech, restricted affect, suicidal thinking, and mildly to moderately impaired judgment, irritability, racing thoughts, and dangerous behavior such as excessive speeding. *Id.* He noted Plaintiff "made veiled threats to others." *Id.* The doctor concluded that Plaintiff "does require regular psychiatric treatment and likely will need to continue that for the duration of his life, because of the severity and chronicity of his psychiatric condition." *Id.*

The ALJ purported to give Dr. Dodson's opinion "significant weight," and determined the opinion required limitations in the RFC including no public contact and only occasional contact with coworkers and supervisors, and limitations to simple and routine work based on his racing thoughts. Tr. 1601. Plaintiff argues the ALJ failed to account for limitations due to deficits in concentration, absenteeism due to isolative behavior, anger, irritability, and defensiveness toward everyone around him. Pl.'s Br. 20. However, as the Commissioner accurately observes, the ALJ did not reject any of Dr. Dodson's conclusions. *Turner v. Comm'r of Soc. Sec.*, 613 F.3d 1217,

1223 (9th Cir. 2010). As such, Plaintiff does not identify any specific error in the ALJ's assessment of Dr. Dodson's opinion.

### E.  John Adler, Ph.D.

Dr. Adler provided psychological evaluations dated June 1, 2007, and April 24, 2008. Tr. 371-73. At the 2007 evaluation, the doctor diagnosed depression and rule out personality disorder NOS. Tr. 373. Plaintiff was "generally pleasant" and cooperative. Tr. 372. He was also noted to have problems focusing and was a poor historian. *Id.* The doctor noted depressed affect and that Plaintiff was easily frustrated. *Id.* Dr. Adler concluded that Plaintiff would be limited by depression and irritability, and to a lesser extent, concentration. Tr. 373. He did not have "clear symptoms of bipolar disorder, but his depression, irritability, and negativity appeared to be longstanding issues. *Id.*

In 2008, Dr. Adler diagnosed the following mental impairments: dysthymic disorder, rule out learning disorder NOS, and personality disorder NOS with antisocial features. Tr. 654. Plaintiff reported to Dr. Adler in 2008 that he had previously walked off jobs and scared family members with his angry behaviors. *Id.* Plaintiff also reported legal problems including a recent arrest and upcoming trial. Tr. 655. Dr. Adler noted that Plaintiff was unspecific or sidetracked in describing his daily activities and "became quite irritated." *Id.*

Dr. Adler observed that although Plaintiff was generally cooperative, he was "not necessarily pleasant," and was at times angry, agitated, and uncooperative. *Id.* Plaintiff appeared depressed, negative, bitter, and angry. *Id.* He was noted to have coherent speech, but rambled and overshared or discussed off-topic details. *Id.* Dr. Adler did not detect delusions, hallucinations, or suicidal ideation. Overall, Dr. Adler opined Plaintiff has mood and behavior problems, depression and irritability, and chronic social and anger problems. *Id.* As noted above, the doctor did not feel

bipolar and manic depression were "quite consistent for him." *Id.* Although Plaintiff did not show signs of "major" mental impairments, he was noted as having problems coping with stress and responding to authority figures. *Id.* Plaintiff could follow simple instructions and complete simple tasks. *Id.*

The ALJ gave "some weight" to Dr. Adler's 2007 and 2008 evaluations. Tr. 1598. The ALJ indicated the doctor's diagnoses were consistent with the medical evidence as whole. *Id.* Plaintiff argues the ALJ did not include all of Dr. Adler's assessed limitations, including his difficulty coping with workplace stressors and responding to authority figures, and that Plaintiff would require one year of treatment before returning to work. Pl.'s Br. 21.

As was the case with the ALJ's treatment of Dr. Dodson's medical opinion, it is not clear that the ALJ erred in assessing Dr. Adler's evaluations. Although the doctor suggested Plaintiff would have difficulty with coping with stress, he did not say Plaintiff was unable to do so, and the RFC reflects a limitation to simple, routine work, which presumably would not be as stressful as more complex or unpredictable responsibilities. Similarly, although Dr. Adler indicated he would have difficulty interacting with supervisors, the ALJ included a limitation to only occasional contact with supervisors and coworkers, and precluded contact with the public. And again, the ALJ did not clearly reject any of Dr. Adler's conclusions. *See Turner*, 613 F.3d at 1223. For these reasons, the Court must defer to the ALJ's interpretation of the evidence, as it is neither irrational nor unsupported by the record. *Burch*, 400 F.3d at 679.

### F.   Caleb Burns, Ph.D.

Dr. Burns examined Plaintiff in an October 30, 2009 psycho-diagnostic evaluation, which included a series of mental health tests. Tr. 1351-60. Dr. Burns ultimately diagnosed moderate major depressive disorder with thought disorder symptoms; bipolar I disorder, unspecified, "now

reasonably well controlled with medication"; panic disorder with agoraphobia; and meth abuse in remission. Tr. 1359. Dr. Burns felt Plaintiff's interview was "reasonably consistent" with the medical records he reviewed, but noted Plaintiff was a poor historian at times because of his frustration. Tr. 1351. Plaintiff reported that he was committed to a psychiatric unit following a suicide attempt where he tried to drive into a tree or telephone pole. Tr. 1353. Plaintiff also reported that his psychiatric medications were helpful, "but I still don't like leaving the house without my mother or brother." Tr. 1354. He also reported past methamphetamine use but stated he had not used for years. *Id.*

Plaintiff described significant financial problems, and reliance on his mother in that area. Tr. 1355-56. For instance, he stated he liked to bowl, but could not afford it anymore. Tr. 1356. Plaintiff explained that on a typical day, he washes dishes, does some laundry, and reads. *Id.* He endorsed difficulty falling asleep, nightmares, and "hearing voices" at night. Tr. 1356-57.

Dr. Burns observed Plaintiff to be "quite gaze avoidant," and his energy level varied with his emotions during the interview. Tr. 1358. He had pressured speech and was noted to be in "substantial distress" on intake. *Id.* The doctor also noted depressed and limited affect and gave the impression of helplessness. *Id.* His attention and concentration were affected by emotionalism. *Id.* Dr. Burns opined Plaintiff's insight and judgment were "somewhat impaired." *Id.* Dr. Burns concluded that Plaintiff's bipolar disorder was reasonably well treated, he was emotionally volatile and quite depressed. Tr. 1359. The doctor also indicated that Plaintiff's depression "makes it very difficult for him to interact with others, [and] to maintain emotional stability[.]" *Id.*

The ALJ accorded "some weight" to Dr. Burns' evaluation. Tr. 1601. The ALJ found the opinion consistent with Plaintiff's medical history but rejected the doctor's opinion "regarding [Plaintiff's] emotional stability because it appears to be based on the claimant's self-report," which

was "inconsistent with a mental status examination showing the claimant as cooperative with the consultative examiner." Tr. 1601. The rationale is clearly erroneous. Dr. Burns personally observed Plaintiff's behavior, and explained that although he was cooperative, he was unusually gaze avoidant, had pressured speech, was in "substantial distress" at intake, had a depressed and limited affect," had impaired judgment, and was demonstrably emotionally volatile. *Supra*. Under *Buck*, it was clear error to reject the doctor's clinical observations.

### G. James Powell, Psy.D.

Plaintiff had yet another psychological examination in November 2011, this time with James Powell, Ph.D. Tr. 1361-67. Dr. Powell ultimately diagnosed mood disorder NOS and noted "occupational difficulties." Tr. 1365. Dr. Powell observed that Plaintiff "did appear to be generally quite angry and did show a tendency to externalize blame for difficulties." Tr. 1366. Dr. Powell did not feel Plaintiff was a danger to himself or others despite reported suicidal ideation. *Id.* The doctor did suggest a moderate level of impairment in socialization and social support and that Plaintiff would likely have difficulty establishing healthy relationships in the future. The doctor also assessed mild impairment in sustained concentration, persistence, and pace; and moderate impairment in managing daily activities. *Id.* Dr. Powell explained that anger and irritability would present a challenge if Plaintiff were to pursue employment and would require a year of vocational rehabilitation to be successful. Tr. 1366-67. Regardless, the doctor indicated "prognosis for him being able to be employed and support himself in the future is considered to be good at this time," but would depend on Plaintiff's decision to work at it, and he might be able to find work "in his area of skills." Tr. 1367.

The ALJ gave "little weight" to Dr. Powell's opinion. As is the case in the ALJ's erroneous discrediting of several other medical opinions above, the ALJ rejected Dr. Powell's as overly

reliant on Plaintiff's subjective symptom reports and inconsistent with "cooperative" behavior during the examination. It appears the ALJ's focus in rejecting Dr. Powell's opinion was the doctor's assertion that Plaintiff would require a year of vocational rehabilitation before he would be able to perform adequately in a work setting. But, for the reasons stated *supra*, neither of the rationales offered by the ALJ are legally sufficient under *Buck*. The finding is erroneous.

### H.  Sharon Knepper, QMHP

Qualified Mental Health Provider Sharon Knepper signed on December 13, 2016 a written statement authored by Plaintiff's attorney. Tr. 3236-37. The letter purports to be a summary of a phone conversation between Plaintiff's attorney and Ms. Knepper, and Ms. Knepper's signature appears to indicate that the contents of the letter accurately reflect her opinion as to Plaintiff's impairments. The letter states that Ms. Knepper had been treating Plaintiff for nearly two years for bipolar disorder and PTSD, and despite his intermittent marijuana use, his mental health symptoms remained significant even when he was abstaining from drug use. Tr. 3236. Ms. Knepper endorsed the statement that Plaintiff is a poor historian and it is difficult to understand whether he is referring to the past or the present when he relates his thoughts. *Id.* She indicated Plaintiff is prone to irritability and ranting, and he often does not have a clear perception of reality. Tr. 3237. She also indicated Plaintiff has a poor ability to deal with stress and significant problems with interpersonal communication. *Id.* His ability to control his reactions to others was noted to be inconsistent and limiting. *Id.* She also endorsed that Plaintiff's problems with shame and PTSD further exacerbate his other psychiatric issues. *Id.*

The ALJ did not address the letter signed by Ms. Knepper, which Plaintiff asserts was error. As a QMHP, Ms. Knepper is a "non-acceptable" medical source under the regulations, and therefore requires an ALJ to provide germane reasons to reject her testimony. 20 C.F.R.

§§ 404.1513(d), 416.913(d); SSR 06-03p, 2006 WL 2329939, at *2 (Aug. 9, 2006); *Ghanim v. Colvin*, 763 F.3d 1154, 1161 (9th Cir. 2014). The Commissioner argues that the letter "contains nothing more than Plaintiff's attorney's summary and interpretation of Ms. Knepper's opinion." Def.'s Br. 12. It is not clear, however, why the fact that Plaintiff's attorney drafted the summary negates the opinions expressed in it, particularly considering there is no dispute that Ms. Knepper endorsed it with her signature. The Commissioner also argues that because Ms. Knepper only began treating Plaintiff in 2015, the opinions expressed are not relevant to the period at issue. *Id.*

The Court agrees that the letter appears to refer only to Ms. Knepper's observations of Plaintiff between 2015 and 2016, and therefore the ALJ's error in failing to address it is not material to the issue of whether he was disabled prior to January 1, 2013. *See Molina v. Astrue*, 674 F.3d 1104, 1122 (9th Cir. 2012) (harmless error rule applies to non-acceptable medical source testimony). As such, the Court may not reverse the decision based on the ALJ's failure to address the letter. Nonetheless, the Court notes that her letter is generally consistent with the opinions of acceptable medical sources who were erroneously discredited as discussed above in terms of the diagnoses of bipolar disorder and PTSD, as well as Plaintiff's significant anger, irritability, and interpersonal skills, as well as the opinion he would have difficulty succeeding in the workplace due to these symptoms. Further, although the statement appears to be most relevant to his symptoms and impairments between 2015 and 2016, several other providers and examiners have opined that similar symptoms are longstanding, chronic issues.

In sum, the ALJ erroneously rejected the otherwise probative medical opinions of Drs. Alvord, Eisenberg, Powell and Burns, and additionally PMHNP Toledo-Silvestre. Their generally consistent opinions suggest greater mental limitations than those set forth in the RFC, and therefore yet another remand is required on those grounds alone.

II.    **Onset and Severity of Plaintiff's Neuropathy**

Plaintiff argues that the ALJ erroneously failed to find Plaintiff's neuropathy impairment was "severe" prior to January 1, 2013, and that a proper evaluation of such would have established that the neuropathy met or equaled one of the presumptively disabling impairments in the Listings from the alleged onset date until December 31, 2012. The Commissioner's position is that the ALJ did not err on either count. This Court previously remanded this case in part to determine if the neuropathy impairment was severe at step two of the sequential evaluation process. Tr. 1716. The issue was also raised at the 2017 hearing. Tr. 1663.

In support of Plaintiff's assignment of error, he cites answers by testifying medical expert Joselyn E. Bailey, M.D., in response to interrogatories posed by Plaintiff's attorney which were made part of the record. *See* Tr. 3282-85. The record includes the following exchange:

> Q: At the hearing on September 6, 2017, you testified that the claimant did not meet or equal a listing before his DLI [date last insured]. Does this continue to represent your opinion regarding whether the claimant met or equaled a listing through the date last insured?

Checking a box labeled "No," Dr. Bailey answered thus:

> A: My interrog [sic] of 5/14/18 stated that the claimant equaled [the] listing of diabetes mellitus 9.08 with peripheral neuropathy 11.14 because his diabetes was uncontrolled causing osteomyelitis causing amputation of the right third toe . . . the additional medical records of 1-18-13 through 11-25-16 confirmed continued uncontrolled diabetes mellitus with A_1_c of 10.8 on 1/14/15 with 2nd foot ulcer 4/2/16 – chronic.

Tr. 3283. Plaintiff contends the ALJ failed to infer a reasonable onset date of the neuropathy impairment under SSR 83-20 despite finding it to be severe as of January 1, 2013, and that Dr. Bailey's response to the interrogatory directs that Plaintiff met a listing prior to DLI. *See* Tr. 1592-93. The ALJ gave "little weight" to Dr. Bailey's answer because Plaintiff never met listing 11.14, although the impairment became severe on January 1, 2013. Tr. 1606-07. The Commissioner

Page 26 – OPINION AND ORDER

asserts that Dr. Bailey's "no" checkmark is merely a typographical error because her response pertains only to the period following the DLI. Def.'s Br. 12-13. The Commissioner further asserts the ALJ did not err in finding the record reflects Plaintiff "never had peripheral neuropathy" to the extent alleged. Tr. 1606.

The Commissioner's argument that the interrogatory answer is a typo fails, as the ALJ appeared to interpret the response at face value. *Id.* Further, nothing in Dr. Bailey's answer suggests that the question or answer was confined to the period after the DLI – in fact, a plain reading of the relevant passages suggests the opposite. On the other hand, Plaintiff's assertion that the ALJ was required to infer an onset date is unavailing, as the ALJ identified an onset date of January 1, 2013.

Even so, the ALJ was allowed to accord the opinion little weight to the extent it was not supported by substantial evidence. Although Plaintiff asserts neuropathy symptoms predated Plaintiff's filing date, he does not identify evidence in support aside from listing neuropathy in his applications. For example, although Plaintiff complained of "pins and needles" in his leg in 2007, relevant objective testing was negative. Tr. 306. A complaint of left leg pain, also in 2007, was attributed to a spinal nerve root injury rather than complications from diabetes. Tr. 460. Other evidence Plaintiff cites in support of his argument does not show neuropathy prior to January 1, 2013. Pl.'s Br. 7; *see* Tr. 2009 (dated 2014), 2011 (dated 2014), 2036 (no evidence), 2056 (dated 2014), 2058 (dated 2014), 2060 (dated 2014), 2062 (dated 2014), 2072 (dated 2014). As such, the ALJ's finding is supported by substantial evidence.

## III.    Plaintiff's Subjective Symptom Testimony

Where a claimant's medically determinable impairments reasonably could be expected to produce some degree of the symptoms complained of, and the record contains no evidence of

malingering, the ALJ may reject symptom testimony only by offering specific, clear and convincing reasons for doing so. *Coleman v. Saul*, 979 F.3d 751, 756 (9th Cir. 2020) (citing *Garrison*, 759 F.3d at 1014-15). Thus, "[g]eneral findings are insufficient; rather, the ALJ must identify what testimony is not credible and what evidence undermines the claimant's complaints." *Brown-Hunter v. Colvin*, 806 F.3d 487, 493-94 (9th Cir. 2015) (citation omitted); *see* Social Security Ruling ("SSR") 16-3p, 2017 WL 5180304, at *8 (Oct. 25, 2017) ("We will explain which of an individual's symptoms we found consistent or inconsistent with the evidence in his or her record and how our evaluation of the individual's symptoms led to our conclusions.").

Plaintiff's symptom allegations are discussed in large part in conjunction with the medical opinion evidence, *supra*. The ALJ found that Plaintiff's allegations were inconsistent with the medical evidence regarding his physical and mental impairments, discounted his allegations based on noncompliance with his diabetes treatment regimen, inconsistent statements about drug use, and the ALJ also mentioned Plaintiff's focus on obtaining disability benefits. *See* Tr. 1596-99; Def.'s Br. 13-16. Plaintiff does not take issue with the ALJ's finding that his physical impairments are inconsistent with the medical evidence. *See* Tr. 1596-97. However, Plaintiff argues that the ALJ failed to properly discredit his symptom testimony regarding his mental impairments and diabetes treatment noncompliance.

The ALJ only provided only a brief explanation for rejecting Plaintiff's mental health complaints. Essentially, the ALJ identified his cooperative demeanor at clinical visits and mental health evaluations, and cognitive assessments inconsistent with his allegations regarding concentration. Tr. 1598. For the reasons described above, Plaintiff's cooperative demeanor at some clinical visits and evaluations is not a clear-and-convincing reason to discredit his allegations of significant anger, irritability, and interpersonal limitations which numerous doctors found to be

limiting or preclusive of work, despite his cooperation. *Supra*. Even where the ALJ did not explicitly err in rejecting medical opinion evidence, such as is the case with Drs. Dodson and Adler and QMHP Knepper, their opinions were generally consistent with Drs. Alvord, Eisenberg, Burns and Powell, as well as the opinion of PMHNP Toledo-Silvestre regarding Plaintiff's behavioral symptoms. Nearly all the medical sources discussed recognized Plaintiff's consistent problems with anger, irritability, disorganized thought processes, attention and concentration problems, significant depression symptoms, poor coping skills, and difficulties interacting with others. *Supra*. Those sources properly based their assessments on their own personal observations of Plaintiff in clinic, review of his medical history, and his self-reported symptoms, despite noting a cooperative demeanor at times. The ALJ's rationale is not clear-and-convincing, and not supported by substantial evidence.

The ALJ's other reasons for rejecting Plaintiff's symptom testimony regarding noncompliance with his diabetes medications are also unpersuasive. In the context of serious mental health issues, "it is a questionable practice to chastise one with a mental impairment for the exercise of poor judgment in seeking rehabilitation." *Nguyen v. Chater*, 100 F.3d 1462, 1465 (9th Cir. 2007) (citation omitted). Such is the case here – numerous providers and examiners noted Plaintiff's poor judgment. The record reflects Plaintiff's failure to follow his prescribed treatments are indicative of the severity of his mental impairments, not that his diabetes is not as severe as alleged, or even is adequately controlled with medication. The rationale is erroneous here.

As explained above, by most accounts Plaintiff's drug use has been a recurrent problem in his life. However, the ALJ determined that his drug use "is not a contributing factor material to the determination of disability." Further, it is a common phenomenon for individuals with significant mental health problems to use drugs to self-medicate, and again, the exercise of poor

judgement in using illicit drugs in the first place is indicative of the poor judgment associated with mental impairment. Further, several treating sources of record explained that Plaintiff's mental health symptoms remained largely unchanged whether Plaintiff was using or not, and other treating and examining medical experts explained that his unusual behavior was not related to substance abuse, despite understanding the potential for that to be the case. *Supra*. To the extent the ALJ disregarded Plaintiff's symptom testimony on his inconsistent reports about drug use, the ALJ's rationale is not clear-and-convincing on this record.

## IV.    Lay Witness Testimony

Plaintiff argues that the ALJ erroneously rejected lay witness statements and hearing testimony provided by Jacqueline W., his mother, and Karl W., his brother. *See* Tr. 86-95. An ALJ must consider statements provided by lay witnesses, and may reject them only for specific, germane reasons. *Bruce v. Astrue*, 557 F.3d 1113, 1116 (9th Cir. 2009). Nevertheless, if an ALJ failed to provide such reasons, the error may be harmless where the ALJ has provided clear-and-convincing reasons to reject substantially similar symptom testimony provided by the claimant. *Molina*, 674 F.3d at 1122.

Both individuals testified at a 2009 ALJ hearing. *See* Tr. 86-95. Plaintiff's mother explained that he lived with her. She has observed him being short-tempered, easily upset or triggered, sleeping a lot, and reclusive. Tr. 87. She testified that she has noticed an increase in reclusiveness and reluctance to leave the house and interact with others. *Id.* She indicated that Plaintiff stays in his house four days per week and does not want to interact with anyone on those days. Tr. 88. She stated that she does most of the household chores, although he does his own laundry when pushed to do so. *Id.* She added that Plaintiff does not like to be in public and must be forced to go grocery shopping. *Id.*

Plaintiff's brother testified at the same hearing. He stated that he sees Plaintiff two or three times a week. Tr. 89. He referred to Plaintiff as a "sloth," and described Plaintiff as moody and angry. Tr. 90. He stated that Plaintiff related to him that people "freak [him] out." *Id.* Karl W. testified that Plaintiff seems stressed out about half the time. *Id.* Plaintiff's brother indicated that he did not think Plaintiff had smoked marijuana since his 2009 motor vehicle accident where he crashed while travelling at high speeds. *Id.* He further described the unpredictability of Plaintiff's mood swings including anger. Tr. 92. He also described Plaintiff as "antsy" in public settings, and although he was social in the past, he had become isolative. Tr. 93. Karl W. also testified that he drives his brother to all his medical appointments because Plaintiff is an erratic driver. Tr. 94.

The ALJ gave "little weight" to Plaintiff's mother's testimony because it was reliant on Plaintiff's self-reports—presumably about his own feelings—and her own observations. Neither is a valid reason to discount the testimony of an individual who lives with a claimant. Tr. 1063; *see* SSR 06-03p, 2006 WL 2329939 (Aug. 9, 2006) (in weighing non-medical lay witness testimony, "it would be appropriate to consider such factors as the nature and extent of the relationship, [and] whether the evidence is consistent with other evidence); *Valentine v. Comm'r Social Sec. Admin.*, 574 F.3d 685, 694 (9th Cir. 2009) (explaining that spouses are often in a position to observe a claimant's symptoms and daily activities at home and are therefore competent to testify about a claimant's condition) (citation omitted).

The ALJ gave "some weight" to the testimony provided by Plaintiff's brother because it was generally consistent with the treatment record showing symptoms of impairment that would limit him to no contact with the public and limited contact with coworkers and supervisors. Plaintiff does not assign specific error to Karl W.'s statement, other than to say it was consistent

with his mother's testimony. The Court agrees. As such, the ALJ provided no valid reason to reject Plaintiff's mother's testimony while accepting in part his brother's.

## V.    RFC and VE Testimony

Based on the ALJ's errors in assessing the opinions of the medical providers and examiners, the symptom testimony provided by Plaintiff, and the competent testimony provided by his mother, the RFC cannot be said to be supported by substantial evidence. For example, the RFC does not contemplate the attention and concentration problems identified throughout the medical opinion and testimonial evidence.

Plaintiff argues that although the ALJ limited Plaintiff to simple and routine tasks, the mere inclusion of a limitation to simple tasks does not properly translate problems in attention and concentration, citing some older cases from this district. Since that time, however, the Ninth Circuit has clarified that simple tasks adequately account for moderate limitations in concentration, persistence, or pace. *See, e.g.*, *Hairston v. Saul*, 827 F. App'x 772, 773 (9th Cir. 2020). Nevertheless, the medical opinions the ALJ erroneously rejected reflect more than moderate limitations. Dr. Eisenberg indicated Plaintiff's moods vary unpredictably from subdued when depressed to manic hyperactivity, including significant problems sitting still and dealing with others. Tr. 1583. Dr. Alvord observed significant irritability and agitation, and that he was "acutely manic" at his third examination. Tr. 1412. The doctor observed inconsistent thought processes and inconsistent mood and affect. Tr. 1412-13. Plaintiff's memory was assessed as severely impaired, which may cause anger, irritability, and low frustration threshold in the context of depression and anxiety. Tr. 1415. Dr. Alvord concluded that considering all of Plaintiff's impairments and symptomatology, his "ability to function in an occupational setting is considered profoundly limited . . . [and] I do not believe he will be capable of even very simple/repetitive work[.]" Tr.

1415-16. Similarly, Dr. Burns opined that Plaintiff's attention and concentration were affected by his "emotionalism," including symptoms of major depressive disorder and related "thought disorder symptoms." Tr. 1359. Treating PMHNP Toledo-Silvestre identified "marked" limitation in attention and concentration for extended periods and in sustaining and ordinary routine without special supervision. Tr. 789.

Plaintiff also argues the RFC limitation to no contact with the public and occasional interaction with supervisors and coworkers did not adequately encompass his limitations—this Court agrees. For instance, Dr. Alvord observed that due to a tendency to overreact, become aggressive, irritable, or angry, he would frequently call in sick or not be able to perform occupational functions. Tr. 1416. Plaintiff's inconsistent work history was "judged diagnostic of a history of PTSD and bipolar disorder." *Id.* Dr. Powell observed that Plaintiff's anger and irritability would make it difficult to gain employment such that he would require a year of vocational rehabilitation to be successful in a workplace. Tr. 1366-37. Dr. Eisenberg commented that Plaintiff's mental health symptoms make it difficult for him to tolerate even a full clinical appointment, as he tries to leave before evaluations are finished. Tr. 1583. Dr. Burns opined that Plaintiff has difficulty interacting with others and tends to isolate himself based on irrational fears of judgment or victimization by others. Tr. 1359. Ms. Toledo-Silvestre indicated Plaintiff would have "marked" limitations in ability to respond appropriately with supervisors, get along with coworkers, and maintain socially acceptable behavior. Tr. 789. She further opined Plaintiff would have "marked" limitation in completing a normal workday or workweek without interference from his mental health symptoms. *Id.*

Although the ALJ did not err in evaluating the opinions of Drs. Adler and Dodson, both doctors' opinions included observations consistent with those rejected by the ALJ. Dr. Adler

observed Plaintiff as easily irritated and opined that dealing with stress and authority figures appeared to be "major problems." Tr. 653. Dr. Dodson noted identified "significant problems with irritability and racing thoughts," as well as making "veiled threats to others." Tr. 723. The letter endorsed by QMHP Knepper reflects similar symptoms and limitations. Tr. 3236-37.

In any event, as stated above, the ALJ's errors in evaluating the medical opinions and testimonial evidence so undermine the RFC that it is not supported by substantial evidence. Likewise, because the VE's answers are premised on the validity of the RFC, those too are undermined, which invalidate the ALJ's step five finding for the period before January 1, 2013.

## VI. Remedy

By statute, a reviewing court "shall have the power to enter a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security." 42 U.S.C. § 405(g). Accordingly, courts may remand a case for immediate payment of benefits without further administrative proceedings. *Garrison*, 759 F.3d at 1019. In the Ninth Circuit, a Social Security case must be remanded to the Commissioner if the ALJ's decision is based on legal error or unsupported by substantial evidence. *Id.* Courts in the Ninth Circuit determine whether a case should be remanded for additional proceedings or immediate payment of benefits pursuant to the "credit-as-true" inquiry, whereby the court determines that (1) the ALJ's decision is invalid on legal or evidentiary grounds; (2) the administrative record is fully developed and further proceedings would serve no useful purpose; and if (3) crediting the improperly discredited evidence as true, an ALJ on remand would be compelled to find a plaintiff disabled. *Dominguez v. Colvin*, 808 F.3d 403, 407 (9th Cir. 2015) (citations omitted).

Based on the ALJ's errors as explained above, the Social Security Administration has failed to provide a legally viable non-disability decision for the third time, despite two remands from the

Appeals Council, three hearings, and two trips to federal court. Step one of the credit-as-true inquiry is met. The voluminous record in this case includes many medical source opinions, including the many which were rejected on invalid grounds, particularly considering the Ninth Circuit's directions for evaluating self-reported mental health issues set forth in *Buck v. Berryhill*. Plaintiff provided testimonial evidence at three hearings. Plaintiff's family members also testified before an ALJ. Consequently, the administrative record in this case is over 3,000 pages long. Despite the Commissioner's argument that any reversible errors in this matter might best be resolved in yet another round of proceedings, the Court does not discern how further development of this record would serve any useful purpose. As Plaintiff observes, there is no doubt that he is now disabled under the Act and has been adjudged to be so as of January 1, 2013. Moreover, the bulk of the medical evidence suggests that his mental limitations are not only disabling as of that date but have been chronic for a very long time. Although there is evidence of drug use in this case, as discussed, such drug use is commonplace in the context of severe mental impairments. Moreover, more than one doctor has provided expert medical opinion evidence that Plaintiff's symptoms have remained consistent whether or not he is using. At times, although Plaintiff has been noted to be "cooperative" at clinical visits, treating and examining doctors have, without exception, also observed symptoms—and often objective medical testing evidence—demonstrating that Plaintiff is profoundly impaired. As was the case with the plaintiff in *Garrison*, Plaintiff's particular symptoms, including the lows of depression and the highs of mania, are characteristic of his "unfortunate" combination of mental disorders, as Dr. Alvord put it.

For these reasons and considering the combined effects of Plaintiff's mental health limitations, the RFC limitations to simple routine tasks and occasional interaction with supervisors and coworkers simply does not square with the ample medical and testimonial evidence. Further,

VE testimony substantiates that Plaintiff is not employable in the national economy. The VE at the first hearing testified that if a worker were to call in sick due to depression symptoms three or more times a month or would have an angry outburst once a month against coworker or supervisor, that person could not maintain employment. Tr. 100. The VE at the third hearing testified that if a worker were to cause noticeable disruptions in the workplace due to anger or irritability, and those disruptions were to continue despite a warning, the person would not be employable. Tr. 1656. The VE also testified that if a worker were off-task 20 percent of the time, he would also be unemployable. Tr. 1657. Step two of the credit-as-true inquiry is met.

The Commissioner has been provided many opportunities to address errors in this matter. As the Ninth Circuit has repeatedly stated, "[a]llowing the Commissioner to decide the issue[s] again would create an unfair 'heads we win; tails, let's play again' system of disability benefits adjudication." *Benecke v. Barnhart*, 379 F.3d 587, 595 (9th Cir. 2004) (citation omitted). This case has spanned nearly a decade. The Commissioner asserts that the "normal" rule is for a court to remand for further proceedings rather than for payment of benefits. But the numerous hearings, extensive medical opinion evidence, and multiple erroneous decisions in this matter demonstrate that this is not a "normal" case. Enough is enough. Considering the extensive record and crediting the erroneously discredited medical opinion and testimonial evidence as true, Plaintiff is disabled under the Act. The Court has no doubt that Plaintiff is not employable in light of the record as a whole. Accordingly, the Court chooses to exercise its discretion to remand this matter for immediate payment of DIB as of the onset date of August 17, 2006, and SSI benefits as of the initial application date of October 12, 2007.

///

///

## CONCLUSION

Based on the foregoing, the decision of the Commissioner is REVERSED and this case

REMANDED for immediate payment of benefits.

DATED this _____9th_____ day of _____March_____ 2021.

_____
MARK D. CLARKE
United States Magistrate Judge